**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **BARBARA J. THOMPSON,**<br><br>Plaintiff,<br><br>v.<br><br>**NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK),**<br><br>Defendant. | Civil Action No. __________<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Barbara J. Thompson, proceeding pro se, alleges as follows:

**I. NATURE OF THE ACTION**

1. Plaintiff Barbara J. Thompson, whose street and mailing address is 130-28 149th Street, Jamaica, New York 11436, brings this action against National Railroad Passenger Corporation, commonly known as Amtrak, whose principal business address is 1 Massachusetts Avenue NW, Washington, DC 20001, arising from alleged race, sex, age, and disability discrimination; failure to reasonably accommodate disability; and retaliation affecting her employment.

2. This action concerns a connected sequence of employer-controlled events involving work-connected lodging and safe access to work, RT Forklift training and qualification, a temporary assignment and return to Plaintiff's last awarded position, materially different treatment at the Clark, New Jersey staging location, disability-related leave and occupational-injury administration, and later employer responses after Plaintiff made protected discrimination and accommodation complaints.

3. Plaintiff does not allege that every workplace disagreement, safety concern, hotel problem, qualification decision, leave determination, or contractual dispute is itself unlawful discrimination.

4. Plaintiff alleges that liability arises from Amtrak's own conduct as employer, including the allocation and completion of employer-provided training, supervisory treatment during work, employer-controlled reporting and staging arrangements, disability-related employment administration, and the employer's later handling of discrimination and accommodation complaints.

5. References to UPRF/BMWED or individual Union representatives are included only where necessary to explain the chronology, what information reached Amtrak, why Plaintiff submitted Amtrak Form NRPC 3476, and how Amtrak later described the employment dispute. Plaintiff does not seek to impose liability on Amtrak merely because a Union representative allegedly acted unlawfully.

6. Plaintiff repeatedly attempted to remain employed. She self-paid for alternate lodging, sought a workable off-property pickup arrangement, temporarily filled another vacancy, returned to her last awarded position when that temporary fill ended, and continued seeking completion of the trainer-led RT Forklift training and qualification process associated with that position.

7. A central discrimination issue concerns Plaintiff's August 2025 RT Forklift training. Plaintiff alleges that approximately four or five younger white male employees who were not scheduled for her training date were permitted to take precedence during portions of the training time scheduled for Plaintiff, an older Black woman, leaving her training rushed and incomplete.

8. A second direct comparator event occurred on September 8 and/or September 9, 2025. At the beginning of the incident Plaintiff, male coworkers, and foremen were on duty and on the clock. At the end of the work period, the male coworkers and foremen were released from duty and permitted to go to their rooms, while Plaintiff, the only woman in the relevant group, was required to remain in the company vehicle for approximately thirty minutes.

9. Following the September events, Plaintiff experienced substantial physical and mental consequences requiring treatment and leave. Amtrak later generated Enablon Incident Report No. INJ 1906230001 concerning the September 8 workplace event, while Plaintiff continued disputing the employer's treatment of her absence and condition as personal or non-work-related.

10. By December 2025, Amtrak's EAP, Ethics, Compliance, Medical Services, Leave Management/HR, Legal, Labor Relations, management, corporate contacts, and other channels had received written notice that Plaintiff was asserting a connected pattern involving gender

discrimination, retaliation, disability-related safe access, training, occupational injury, leave classification, privacy, and return-to-work consequences.

**II. PARTIES AND EMPLOYMENT RELATIONSHIP**

11. Plaintiff Barbara J. Thompson is an Amtrak employee. At all relevant times she was a Black woman, born in 1962, and over forty years of age.

12. Plaintiff also had an actual disability and a record of disability during the relevant period, as alleged more fully below.

13. Defendant National Railroad Passenger Corporation, commonly known as Amtrak, is Plaintiff's employer and is a covered employer under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the Age Discrimination in Employment Act.

14. Amtrak's corporate headquarters is located at 1 Massachusetts Avenue, N.W., Washington, D.C. 20001.

15. The employment events central to this action occurred in substantial part in Clark and Hamilton, New Jersey, and involved Amtrak supervisors and managers, bargaining-unit foremen, training personnel, corporate contacts, EAP, Medical Services, Leave Management/HR, Ethics, Compliance, Labor Relations, Engineering/Workforce Management, and Return to Work personnel.

16. During the relevant period Plaintiff was a bargaining-unit employee represented by UPRF/BMWED. The Union is not named as a defendant in this action against Amtrak.

**III. JURISDICTION AND VENUE**

17. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff's federal claims arise under Title VII, 42 U.S.C. § 2000e et seq.; the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.

18. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claim under the New Jersey Law Against Discrimination because that claim forms part of the same case or controversy as the federal claims.

19. Venue is proper in the District of New Jersey under 42 U.S.C. § 2000e-5(f)(3), 29 U.S.C. § 626(c), and 28 U.S.C. § 1391 because a substantial part of the alleged events occurred in New Jersey and the employment records and practices at issue concern Plaintiff's New Jersey assignment and work.

20. Material alleged events occurred in or concerned Clark, New Jersey, including work-connected lodging/headquarters/staging, the safe-access arrangement, Plaintiff's September 8 return, the vehicle/staging treatment, and later employer handling of those events.

21. Plaintiff demands a jury trial on all claims and issues for which a jury trial is available.

## IV. EEOC EXHAUSTION AND TIMELINESS

22. Plaintiff filed EEOC Charge No. 524-2026-01134 against National Railroad Passenger Corporation/Amtrak.

23. The EEOC Newark Area Office received Plaintiff's charge on May 8, 2026. The charge was filed within 300 days of the August and September 2025 employment events alleged here.

24. The charge identified Race, Color, Sex, Age (40+), Disability, and Retaliation and concerned the employer conduct described in this Complaint.

25. The EEOC Newark Area Office issued a Dismissal and Notice of Right to Sue on May 27, 2026.

26. The Notice advised Plaintiff that a federal action based on the charge must be filed within ninety days of her receipt of the Notice.

27. This action is filed within ninety days of May 27, 2026 and therefore within ninety days of any possible receipt of a Notice that was not issued until that date.

28. Plaintiff later sought EEOC reconsideration and submitted organized supplemental evidence explaining that the charge involved a connected workplace pattern rather than isolated hotel, medical, Union, training, or administrative issues.

29. Plaintiff does not rely upon the reconsideration request to toll, restart, or extend the ninety-day federal filing period.

30. Plaintiff alleges that the statutory claims based on the charged conduct are within the scope of the EEOC charge or are reasonably related to, and reasonably expected to grow out of investigation of, that charge. Later 2026 events are pleaded principally as continuing consequences, evidence of employer notice and the ongoing accommodation/leave process, and, only to the extent permitted by law, as independently actionable post-charge conduct; Plaintiff does not rely on those later events to expand administrative exhaustion beyond what the law allows.

**V. INDEPENDENT STATUTORY RIGHTS AND THE RAILWAY LABOR ACT**

31. Plaintiff does not plead a cause of action for breach of the collective-bargaining agreement and does not ask this Court to enforce Rule 4, Rule 64, or any other collective-bargaining provision as an independent source of liability against Amtrak.

32. References to bidding, temporary-fill status, seniority, Rule 4, Rule 64, the Training Agreement, and other collectively bargained procedures are included to describe the factual employment setting, the explanations Amtrak gave for its actions, the records relevant to those explanations, and Plaintiff's evidence of pretext, motive, causation, and damages.

33. Plaintiff's discrimination, accommodation, and retaliation claims arise from rights created independently by Title VII, the ADA, the ADEA, and the NJLAD.

34. Plaintiff does not ask the Court to decide that the CBA itself guaranteed her a particular bid, award, grievance outcome, or contractual remedy in order to impose statutory liability.

35. To the extent Amtrak contends that a particular contractual issue constitutes a minor dispute governed by the Railway Labor Act, Plaintiff seeks no independent contract remedy on that issue in this action.

36. Plaintiff alleges that the statutory claims can be resolved by examining Amtrak's own treatment, comparative conduct, disability notice and accommodation handling, protected-activity knowledge, reasons given for challenged decisions, and other evidence without converting this action into a suit to interpret or enforce the CBA.

**VI. PLAINTIFF'S WORK STATUS, QUALIFICATIONS, AND PROTECTED STATUS**

37. Before the events underlying this action, Plaintiff was working, performing her duties, advancing through Amtrak positions, and using the applicable bidding and seniority system to maintain employment.

38. Plaintiff had advanced to B&B Foreman and later held the B&B Mechanic (RT Forklift) position implicated in the RT Forklift qualification dispute.

39. Amtrak's March 27, 2026 written response to Plaintiff's Rule 64 claim identified an award date of July 21, 2025 for the position associated with the RT Forklift qualification issue.

40. An Amtrak advertisement dated September 1, 2025 for one permanent B&B Mechanic (RT Forklift) position identified the headquarters as variable, Clark, New Jersey, expressly listed FORKLIFT RT as a qualification, and stated 'VICE Nwobi, Barbara.' Plaintiff alleges, based on her knowledge of Amtrak/BMWED job-advertisement terminology, that the VICE designation reflected that she held the position being advertised during her temporary absence.

41. The FORKLIFT RT qualification was materially connected with Plaintiff's ability to perform, retain, and protect the employment opportunity associated with that position. Plaintiff alleges that the ordinary RT Forklift process was trainer-led: the trainer demonstrated operation of the equipment, provided instruction and hands-on operating experience, observed the employee operating the equipment, and determined from the training session whether the employee qualified.

42. Plaintiff alleges that her scheduled trainer-led RT Forklift training and qualification process was interrupted before completion. She sought completion of that regular process and was not asking for a lowered qualification standard, special training, or an automatic qualification.

43. Plaintiff's record of mental-health impairment predates the 2025 events. A World Trade Center Health Program certification letter dated October 25, 2017 states that the Program's records reflect a December 24, 2013 certification in the WTC-related health-condition category 'Mental Health.'

44. During the relevant period, a treating provider documented PTSD, anxiety, and depression following a workplace crisis that resulted in psychiatric hospitalization, documented episodes involving loss of a sense of time and space and associated physical symptoms, stated that the symptoms significantly affected Plaintiff's ability to function, and certified that a consecutive period of leave was medically necessary.

45. Plaintiff alleges that during acute periods the impairment substantially limited one or more major life activities, including working and cognitive functioning, and also constituted a record of such impairment.

46. Before the acute workplace-connected collapse, Plaintiff's mental-health history had not prevented her from working, advancing, or performing her employment.

47. Plaintiff alleges that she remained qualified to perform the essential functions of available employment with reasonable accommodation as applicable, including workable safe-access and return-to-work arrangements.

**VII. CLARK, NEW JERSEY WORK-CONNECTED LODGING/HEADQUARTERS AND SAFE ACCESS**

48. During 2025, Plaintiff worked in connection with an assignment centered in Clark, New Jersey.

49. The Holiday Inn Clark location was used in connection with the assignment as lodging, headquarters, staging, pickup, drop-off, and/or crew movement.

50. On or about June 24-25, 2025, Plaintiff experienced a prolonged power-outage and extreme-heat event at that location during which she remained on the fifth floor for approximately fourteen hours and later raised safety, emergency-lighting, generator, staff-response, fire-safety, egress, and related concerns.

51. Plaintiff later encountered additional conditions she considered unsafe or intolerable, including pest and sanitation problems and an August dispute involving a hotel front-desk manager and a credit-card charge.

52. Plaintiff alleges from personal recollection that after the June power-outage event she orally reported the event and her condition to Track Foreman Diduch, a bargaining-unit foreman rather than Amtrak management. Plaintiff alleges that Diduch told her he had gone home during the outage and responded to her report by giving her an easier workday. Plaintiff is not aware of an Enablon incident report having been generated from that June oral report.

53. On August 20, 2025, Plaintiff informed Amtrak foreman Eric that she could no longer continue staying at the Holiday Inn Clark, had checked out, remained committed to working, and would obtain alternate lodging herself.

54. Plaintiff asked to board the crew truck off the property as it pulled out so that she could continue reporting to work without entering or staging from the hotel property.

55. Foreman Eric approved that pickup arrangement and stated in substance, 'Yes that is fine we will make it work.'

56. Plaintiff relied upon the off-property pickup arrangement and continued attempting to work. The arrangement demonstrated that work could be performed while Plaintiff avoided entering or staging from the hotel property.

57. On August 21, 2025, Plaintiff requested PTO because of stress and anxiety, physical symptoms, and the need to regroup. Eric acknowledged the request and coordinated approval through foreman Troy.

58. Plaintiff nevertheless continued attempting to work, including working an overnight assignment and using the approved pickup arrangement.

59. Plaintiff pleads the August arrangement as a practical off-property pickup arrangement approved by Foreman Eric and actually used to continue working. The separate disability-related accommodation requests alleged below were made later, after Amtrak had more explicit disability-related notice.

**VIII. FIRST TEMPORARY BUS DRIVER FILL AND SEPTEMBER 8 RETURN**

60. After the Clark conditions escalated, Plaintiff temporarily filled a Bus Driver vacancy in Belcamp, Maryland as a safety and employment-preservation step while continuing to work.

61. Plaintiff alleges that she did not submit an affirmative bid seeking a permanent Bus Driver award for that first assignment.

62. Plaintiff's September 5, 2025 contemporaneous correspondence stated that she was 'filling a vacancy' in Belcamp and that she had to leave that position because it had been awarded to another employee.

63. In a separate September 5 email, Plaintiff stated that September 5 was her last day in that Bus Driver position and that the new employee would start Monday, September 8, 2025.

64. When the temporary fill ended, Plaintiff had to return on September 8 to what she contemporaneously identified as her last awarded position, the B&B Mechanic RT position in Clark, New Jersey.

65. The unresolved RT Forklift training and qualification issue remained connected with that last awarded position.

66. Plaintiff therefore disputes any characterization that the first temporary Bus Driver fill constituted a voluntary permanent abandonment of the position or of the unresolved RT Forklift qualification issue.

**IX. SEPTEMBER 4-5 CORPORATE NOTICE BEFORE PLAINTIFF'S RETURN**

67. On September 4-5, 2025, Plaintiff escalated the Clark lodging/headquarters complaint through CLC/Corpay Lodging. Corpay Account Manager Elizabeth Shimkovitz received the complaint materials and advised Plaintiff that she was looping in Amtrak corporate contacts Jessica Fuller and Aaron Moyer.

68. Plaintiff's written complaint described the June power-outage/extreme-heat event, lack of emergency lighting and staff response, later pest conditions, the credit-card/front-desk dispute, her

scheduled September 8 return to Clark, the stress associated with returning, and her request for immediate and decisive intervention.

69. Amtrak corporate contacts, including Aaron Moyer and Jessica Fuller, were looped into the complaint before Plaintiff's September 8 return.

70. The documented response did not provide Plaintiff a completed relocation plan, a written protective plan, or written assurance preserving the off-property pickup arrangement before she returned.

71. Although Moyer and Fuller were brought into the complaint chain before Plaintiff's September 8 return, the substantive written response from Moyer reflected in the record came after Plaintiff had returned. Moyer explained that CLC and its Account Management team could not provide an immediate relocation because changes to Plaintiff's assigned location required prior approval from IMCS Management, and he directed Plaintiff to raise the relocation request with her Supervisor so it could be escalated for consideration. No completed relocation or protective plan had been communicated to Plaintiff before her return.

72. Plaintiff alleges that this was material because the safe-access issue had already been placed in Amtrak's corporate lodging channels before September 8, yet no management decision resolving that issue was communicated to Plaintiff before the matter returned to the B&B/IMCS operational chain in which Supervisor Clive and Assistant Supervisor Keith later acted.

73. Plaintiff was not refusing work. She was notifying Amtrak that she intended to return to her last awarded position but needed a workable way to do so without being placed back into the location she had reported as unsafe.

**X. RT FORKLIFT TRAINING AND YOUNGER WHITE MALE COMPARATORS**

74. During August 2025, Plaintiff participated in a scheduled RT Forklift trainer-led training and qualification session at an Amtrak Maintenance-of-Way training location in Hamilton, New Jersey.

75. Plaintiff alleges that the ordinary RT Forklift process was trainer-led: the trainer demonstrated operation of the equipment, instructed the employee, provided hands-on operating experience, observed the employee applying the instruction and operating the equipment, and determined from the session whether the employee qualified.

76. Plaintiff alleges from personal observation and knowledge that approximately four or five additional employees who received priority during portions of the training period were younger white men.

77. Plaintiff alleges that those employees were not scheduled for Plaintiff's training date.

78. Plaintiff was the older Black woman for whom the training opportunity had been scheduled.

79. Plaintiff does not challenge Amtrak's ability to train multiple employees during a training session and does not allege that other employees should have been barred from training.

80. Plaintiff's complaint is narrower: during the session scheduled for her, additional younger white male employees were permitted to take precedence during portions of her scheduled training time, causing her own trainer-led process to be shortened and divided.

81. Plaintiff alleges that Trainer Greg could have completed the trainer-led RT Forklift training and qualification process already scheduled for Plaintiff first and then trained additional employees afterward, including multiple employees if the remaining time permitted.

82. Instead, Plaintiff alleges that portions of her scheduled training time were diverted to the additional younger white male employees and that her own trainer-led training and qualification process was rushed, divided, and left incomplete.

83. On or about August 25, 2025, Plaintiff communicated with Trainer Greg concerning completion of the remaining training. Plaintiff alleges that after she explained she was then working in Maryland because she had left the Clark environment for safety reasons, Greg stated in substance that because she had left, he did not have to complete her training.

84. Plaintiff contemporaneously continued raising the incomplete-training problem and did not treat it as resolved.

85. Plaintiff alleges that the interruption of her scheduled trainer-led training and qualification process materially affected a concrete qualification and employment opportunity and therefore constituted more than a trivial workplace inconvenience.

**XI. NRPC FORM 3476 - WHAT IT IS AND WHAT IT IS NOT**

86. On August 27, 2025, after Plaintiff contacted Union representative Thomas Wohanka concerning the incomplete RT Forklift training, Wohanka directed or suggested that Plaintiff submit Amtrak NRPC Form 3476, Request to Demonstrate Qualifications.

87. Plaintiff thereafter submitted NRPC Form 3476 to Amtrak in connection with the RT Forklift and copied Wohanka. A copy of the completed form is attached as Exhibit A.

88. NRPC Form 3476 expressly states: 'YOU MUST BE PROFICIENT IN YOUR ABILITY TO MAINTAIN AND OPERATE ANY EQUIPMENT OR MACHINE LISTED ABOVE. THIS IS NOT A TRAINING OPPORTUNITY.'

89. By its own terms, Form 3476 is a request to demonstrate existing qualifications on identified Maintenance-of-Way equipment and presupposes that the employee already possesses the proficiency necessary to demonstrate qualification.

90. Form 3476 is not a request for training and does not purport to provide the instruction or hands-on operating experience provided through the trainer-led RT Forklift process.

91. Plaintiff's reported problem was different: she alleges that the trainer-led training and qualification process scheduled for her had been interrupted before completion, while Form 3476 expressly required existing proficiency and provided no training opportunity.

92. Plaintiff therefore alleges that movement of the issue from incomplete trainer-led training to a Request to Demonstrate did not replace or complete the training and qualification process that had been interrupted.

93. Plaintiff does not attribute Wohanka's conduct to Amtrak merely because he was a Union representative. Her claim against Amtrak concerns Amtrak's own training decisions, its administration of its qualification process, and its later express adoption of Request to Demonstrate as the employer's asserted proper route after Plaintiff had reported incomplete training.

**XII. SEPTEMBER 8-9 VEHICLE/STAGING EVENT AND DIRECT SEX COMPARATOR**

94. Plaintiff returned to the Clark assignment on September 8, 2025 after the temporary Bus Driver vacancy she had been filling was no longer available to her.

95. Before that return, Plaintiff had already checked out of the Holiday Inn Clark, was paying for alternate lodging herself, had successfully used the off-property pickup arrangement, and had requested corporate intervention concerning her return.

96. On the morning of September 8, Plaintiff communicated about her return and off-property pickup with B&B Foremen Eric and Troy Roth. Eric had known of and approved the off-property pickup arrangement in late August. Troy learned of Plaintiff's requested pickup/entry arrangement that morning. Plaintiff alleges that the detailed Clark hotel concerns and request for immediate intervention had been supplied through CLC/Corpay to Elizabeth Shimkovitz and Amtrak corporate contacts Aaron Moyer and Jessica Fuller. Plaintiff does not allege, without discovery, that Eric or Troy had received the full details of that corporate complaint.

97. Before Assistant Supervisor Keith arrived, Plaintiff was standing near Troy Roth's truck when Roth received a telephone call. Plaintiff personally heard the caller ask, 'Do you know what is going on with Barbara and the hotel?' Roth looked directly at Plaintiff and answered, 'Nope.' Plaintiff does not presently know the identity of the caller.

98. Plaintiff alleges that this call is relevant to the information-flow chronology because an unidentified caller already knew there was an issue involving Plaintiff and the hotel and was checking Roth's knowledge shortly before Keith arrived. Plaintiff does not allege that the caller was Clive, Moyer, Fuller, or any other particular person without supporting records.

99. Plaintiff did not contact Assistant Supervisor Keith, did not ask Keith to come to the jobsite, and had no direct communication with Keith arranging his intervention.

100. Later that day, Assistant Supervisor Keith approached Plaintiff at the jobsite and told Plaintiff that Supervisor Clive had sent him. Plaintiff understood Clive to be the Supervisor over the relevant IMCS/B&B operational group.

101. Plaintiff presently does not know what information Supervisor Clive received before sending Keith, what Clive told Keith, who communicated Plaintiff's return or hotel-related issue to Clive, or whether Clive had received the detailed CLC/corporate complaint or only a more limited account.

102. Keith did not first obtain or meaningfully hear Plaintiff's account of the existing off-property pickup arrangement and the reasons she had been avoiding the Clark property before acting on the instruction. Keith then directed or caused Plaintiff to be taken into the Clark headquarters/lodging parking or staging area and required or enforced the requirement that Plaintiff remain in the company vehicle for approximately thirty minutes.

103. At the beginning of the incident, Plaintiff, the male coworkers, and the foremen in the relevant group were still on duty and on the clock.

104. Plaintiff was the only woman in the relevant vehicle/staging group.

105. At the end of the work period, the male coworkers and foremen in the relevant group were released from duty and permitted to leave the vehicle or staging area and go to their rooms at the headquarters/lodging location.

106. Their release ended their work period, while Plaintiff alone was required to remain in the company vehicle for approximately thirty minutes.

107. Plaintiff alleges that the different manner of release presented a direct sex-based disparity: male employees were permitted to end their work period and go to their rooms, while Plaintiff, the only woman in the group, was kept in the company vehicle.

108. Plaintiff alleges from personal knowledge that Assistant Supervisor Keith, who imposed or enforced the vehicle restriction, was a white man. Plaintiff relies on that fact as additional race-and-sex context; the direct comparator allegation for this event is the male-versus-female release treatment.

109. The event occurred after different Amtrak channels possessed different pieces of relevant information: Eric knew of the off-property pickup arrangement from late August; Troy knew of Plaintiff's requested pickup/entry arrangement on the morning of September 8; and CLC/Corpay, Moyer, and Fuller had received the detailed hotel complaint and request for intervention before Plaintiff's return. Plaintiff does not allege, without discovery, exactly which of those facts reached Clive or Keith before Keith acted.

110. Plaintiff seeks discovery concerning the September 8 information flow, including the identity of the caller who asked Troy whether he knew what was going on with Plaintiff and the hotel; relevant call logs, texts, Teams messages, radio or other communications; communications from CLC/Corpay, Moyer, Fuller, or other corporate personnel to IMCS/B&B supervision; communications among Clive, Keith, Eric, Troy, and upper supervision; and the instructions Clive gave Keith concerning Plaintiff's return, lodging status, safe-access arrangement, and staging.

111. Plaintiff relies upon the September event as an employer-controlled terms-and-conditions event, not as a claim that Amtrak is liable merely because a hotel was unsafe.

## XIII. MEDICAL COLLAPSE, TREATMENT, AND WORKPLACE-CONNECTED REPORTING

112. Following the September 8-9 events, Plaintiff experienced a substantial physical and mental collapse and required medical treatment and leave.

113. Plaintiff entered intensive treatment, including inpatient psychiatric treatment, and later continued outpatient mental-health care.

114. Plaintiff consistently asserted that the collapse and resulting absence were connected to the workplace events and were not simply an unrelated personal medical condition.

115. Amtrak later generated Enablon Incident Report No. INJ 1906230001 associated with the September 8, 2025 workplace event.

116. Plaintiff also pursued Railroad Retirement Board sickness/occupational-injury documentation identifying the matter as work-related.

117. Plaintiff repeatedly sought correction of Amtrak's records and administrative handling to reflect the workplace-connected nature of the condition.

118. Plaintiff alleges that Leave Management and other administrative channels continued at points to treat or describe her absence as a personal health condition or non-work-related illness.

119. Plaintiff alleges that the disputed classification affected or threatened her leave status, benefits, employment record, access to treatment-related processes, privacy, and return-to-work administration.

120. Plaintiff disclosed sensitive mental-health information because she was trying to obtain treatment, preserve leave and employment status, correct the work-related classification, and return to work.

121. Plaintiff does not bring a freestanding medical-malpractice or workers' compensation claim in this Complaint. The medical and occupational records are alleged as evidence of disability, notice, employment consequences, and damages relevant to the statutory discrimination and accommodation claims.

122. On September 14, 2025, after the September staging events and as she was seeking intensive treatment, Plaintiff followed EAP guidance to notify Bus Driver Supervisor Louis 'Louie' Pilachowski using limited privacy-protective wording that she was calling out sick, seeking medical treatment, and would not be checking into the hotel. Plaintiff does not allege that this limited

September 14 message, standing alone, constituted an occupational-injury report; she relies on it to explain the EAP-directed privacy boundary and the later injury-reporting chronology.

**XIV. EAP RECORD, PRIVACY BOUNDARIES, AND DISPUTED CLASSIFICATION**

123. EAP was an important Amtrak channel in Plaintiff's treatment, leave, and return-to-work history, but Plaintiff consistently distinguished EAP treatment-related information from the employment and occupational-classification records she was asking Amtrak to address.

124. On December 2, 2025, Plaintiff asked Lead EAP Counselor Ellyn Kravette for administrative assistance transmitting Railroad Retirement Board injury-related paperwork.

125. On December 4, 2025, Kravette responded in substance that she was confused because the paperwork concerned an injury at a hotel and not a mental-health matter, and stated that the hotel injury had nothing to do with the EAP-recommended treatment for a mental-health concern.

126. Plaintiff immediately disputed that separation in writing and explained that her account to EAP and her treatment providers had consistently connected the workplace/hotel events, resulting physical symptoms, psychiatric trauma, treatment, and incapacity.

127. Plaintiff asked that her written correction be preserved in her EAP file. Kravette replied that she would add it to Plaintiff's file, with EAP contact DeVaron Flint copied.

128. On May 8, 2026, Plaintiff separately requested access to EAP-maintained administrative and case-management records for her own review, expressly excluding psychotherapy notes and expressly declining authorization for disclosure of those requested records to Amtrak Legal, agents, or third parties.

129. That May request sought, among other administrative categories, any intake or triage records, referral or authorization records, case-management logs, classification or status entries if EAP maintained them, release forms, EAP communications, and provider-contact logs, and asked EAP to identify the proper custodian for any category it did not maintain.

130. Plaintiff does not allege merely from making that request that EAP actually created the disputed personal-versus-occupational classification; the request is pleaded to show Plaintiff's effort to identify the source of that classification and obtain the underlying administrative record.

131. On June 18, 2026, Plaintiff confirmed in writing to EAP contact Veronica 'Vee' Verges in Pennsylvania that an EAP Release of Information she had completed was limited to dates of attendance or participation only.

132. Plaintiff expressly excluded diagnosis, treatment notes, therapy content, clinical impressions, medications, treatment history, provider records, disability details, and other medical or mental-health information from that release, while separately advising that her therapist had sent the return-to-work form to Medical Services.

133. Plaintiff alleges that these communications show cooperation with employment-related leave and return-to-work requirements while maintaining specific privacy boundaries concerning unnecessary disclosure of detailed treatment information.

**XV. DECEMBER 2025-JANUARY 2026 EXPLICIT PROTECTED ACTIVITY AND AMTRAK NOTICE**

134. By December 2025, Plaintiff was placing Amtrak directly on written notice that she believed the connected events involved discrimination, retaliation, disability-related safe access, occupational injury, and employment-record consequences.

135. On December 18, 2025, Plaintiff submitted a SpeakUpAmtrak/Ethics report, Ethics Case No. 2512-AMTRK-40014-01, expressly alleging systemic retaliation and gender-based discrimination, along with safety and occupational-injury reporting concerns.

136. That submission specifically identified the September vehicle/staging treatment, the release of male crew members, the RT Forklift training problem, and the actions of identified supervisory or training personnel.

137. Plaintiff requested investigation of the missing Enablon report and the employer conduct she believed had produced discriminatory, retaliatory, safety, and employment consequences.

138. On December 19, 2025, Plaintiff sent a written submission concerning leave reclassification, a requested safety accommodation, and occupational-injury handling, with supporting records concerning Clark, the pickup arrangement, training, the September return, treatment, and Form 3476.

139. Amtrak Medical Services forwarded Plaintiff's leave-reclassification and safety-accommodation concerns to Chief Medical Officer Dr. Ann Kuhnen and Return to Work.

140. Dr. Kuhnen responded on December 19. Her response acknowledged that Plaintiff had filed an Amtrak Helpline report and that supervisors were aware of Plaintiff's complaints about the hotel, and explained the internal route for an Enablon report, safety investigation, and work-relatedness determination.

141. On December 22, 2025, Plaintiff submitted additional written material concerning the injury/Enablon record and asked that supporting evidence be linked to the internal Ethics matter.

142. On December 23, 2025, Amtrak Deputy General Counsel Michael J. Alexis advised that Plaintiff's supplemental materials had been referred to Enterprise Compliance.

143. On January 3, 2026, Plaintiff again amended the internal record and provided notice to Ethics, Compliance, Medical Services, and management.

144. On January 5, 2026, Amtrak Deputy General Counsel Thomas S. Bloom advised that Compliance would route the concerns to the appropriate office.

145. Plaintiff alleges that these communications establish employer notice, through multiple responsible channels, of her express discrimination opposition and disability/accommodation concerns before Amtrak's later March 2026 written denial of the connected employment claim.

146. Plaintiff does not allege that her December 18 discrimination complaint caused the September 8-9 staging event, which necessarily occurred earlier. The September event is pleaded principally as

discriminatory treatment and factual background; the Title VII retaliation claim concerns employer conduct occurring after Amtrak received protected discrimination opposition.

147. On December 19, 2025, Deputy Chief Engineer Production Kristin Leese documented that Dr. Kuhnen had directed Plaintiff toward the Amtrak injury-reporting process and that Plaintiff had contacted Bus Driver Supervisor Louis Pilachowski. Leese identified the NY B&B chain, rather than Pilachowski, as the unit associated with the underlying Clark events, copied Senior Manager Kyle Boomhower, and later instructed Plaintiff to communicate directly with Boomhower so the report could be submitted.

148. On December 22, 2025, Boomhower provided Enablon Incident Report No. INJ 1906230001 associated with the September 8, 2025 event, while Aaron Moyer and Jessica Fuller were copied in the reporting chain.

## XVI. MARCH 2026 RULE 64 CLAIM AND AMTRAK'S WRITTEN POSITION

149. On March 4, 2026, Plaintiff submitted a written Rule 64 claim to Amtrak Labor Relations and other responsible channels to preserve employment issues involving her work record, training, leave handling, bidding/assignment access, and the conditions under which she could safely work.

150. Plaintiff expressly distinguished that employment claim from the separate OSHA/FRSA proceeding and stated that she was not asking Labor Relations to conduct the OSHA investigation.

151. Before submitting the March claim, Plaintiff sought procedural guidance from Amtrak Labor Relations. Senior Manager, Labor Relations Madeleine Respler responded on March 2, 2026 by providing the designated-officer list and directing Plaintiff to Rule 64 of the collective-bargaining agreement.

152. On February 27, 2026, Plaintiff had also written Labor Relations contact Aaron Buck and Compliance to distinguish the union/labor matter from the OSHA/FRSA investigation and to ask for the proper Amtrak point of contact for union-related communications affecting her employment, training, and leave record.

153. Plaintiff requested a written safe-work arrangement that would permit lodging at a different nearby hotel or another agreed off-property location and would allow pickup and drop-off without requiring her to report to, enter, pass through, or stage from the Holiday Inn Clark property.

154. On March 27, 2026, Amtrak issued a written response to Claim No. 294826 addressing the Clark lodging/safe-work request, the RT Forklift training dispute, Union-related background, leave handling, and Plaintiff's work record. Plaintiff possesses materially similar March 27 versions bearing the signatures of Deputy Chief Engineer - Production Kristin Leese and Senior Manager Workforce Planning & Management Bill Lee Jo Titlow. Plaintiff does not presently know which version Amtrak treated as final or controlling, or the respective roles of Leese and Titlow in preparing, reviewing, approving, or issuing the decision.

155. The March 27 response recognized that Plaintiff alleged her RT Forklift training day had been overtaken by multiple additional employees, that the training was cut short, and that she did not receive the full training opportunity she believed was required.

156. Amtrak responded that training multiple employees in one session was common practice and that it did not typically provide one-on-one equipment training.

157. Plaintiff does not dispute that Amtrak could train multiple employees in a session. Her complaint was not a request for special, individualized, or one-on-one training; it was that additional younger white male employees were permitted to take precedence during portions of the trainer-led session scheduled for her, leaving her own training and qualification process incomplete.

158. Both March 27 versions stated that Plaintiff had told the trainer she did not feel ready 'to test to qualify' and wanted additional training.

159. Plaintiff alleges that Amtrak's 'test to qualify' wording did not accurately describe the trainer-led process in which she had been participating. That process involved equipment demonstration, instruction, hands-on operating experience, observation of the employee's operation of the equipment,

and a trainer determination from the session whether the employee qualified; Plaintiff alleges that process was interrupted before completion.

160. Amtrak then stated that because Plaintiff had filled a vacant Bus Driver position on or about August 24, 2025, she no longer had a right to train for the RT Forklift and that her 'only option' or correct action was a Request to Demonstrate.

161. Amtrak further characterized Plaintiff as having 'abandoned' the awarded position by filling the vacancy.

162. Plaintiff disputes that factual premise. Her September 5 contemporaneous records described the Maryland Bus Driver position as a vacancy she was filling temporarily, documented that it had been awarded to another employee, and documented her return to her last awarded position on September 8.

163. Plaintiff alleges that Amtrak's March 27 response did not reconcile those contemporaneous temporary-fill and return records before treating the movement as abandonment of the RT Forklift-associated position.

164. The March 27 response also stated that Amtrak Medical had deemed Plaintiff's leave a non-work-related injury coded as personal illness, notwithstanding Plaintiff's repeated workplace-injury notices and the later Enablon record she was relying upon.

165. Both March 27 versions denied the claim in its entirety and described it as vague, untimely, and procedurally defective. The version bearing Bill Lee Jo Titlow's signature additionally stated that Plaintiff's alleged issues were 'baseless and frivolous.'

166. Plaintiff alleges that the March 27 denial constituted a fresh employer decision concerning the connected training, safe-access, work-record, and leave matters after Amtrak had received her December discrimination complaint and disability-related accommodation requests.

167. Plaintiff relies on the March 27 responses as evidence of Amtrak's stated reasons, its knowledge of the disputes, its refusal of requested employment relief, and the timing of later employer action. Plaintiff does not plead the denial itself as a freestanding CBA-breach claim.

**XVII. LATER BUS DRIVER ASSIGNMENT AFTER SEPTEMBER EVENTS**

168. After the September 8-9, 2025 events, Plaintiff was already experiencing substantial distress from the earlier Clark lodging and safety events, the unresolved RT Forklift training and qualification problem, and the treatment she experienced after seeking help.

169. Plaintiff alleges that being required to remain in the company vehicle in the Clark area triggered prior trauma and intensified her fear that she could again be confined or subjected to similar treatment at the location she had reported as unsafe.

170. At the same time, the RT Forklift qualification remained unresolved and materially affected Plaintiff's ability to retain and perform the B&B Mechanic (RT Forklift) position.

171. Rather than stop working, Plaintiff left the Clark assignment environment and filled a Bus Driver vacancy in the Baltimore/Maryland area so that she could continue working away from Clark.

172. This later Bus Driver event was separate from the first temporary Belcamp fill that ended before Plaintiff's September 8 return to her last awarded B&B Mechanic (RT Forklift) position.

173. Plaintiff pleads the later Bus Driver event as context for her effort to remain employed while avoiding the Clark environment; she does not ask the Court to adjudicate Rule 4, automatic-bid mechanics, or any other CBA provision as an independent claim.

**XVIII. DISABILITY NOTICE, ACCOMMODATION REQUESTS, AND RETURN-TO-WORK CONSEQUENCES**

174. The August 2025 off-property pickup arrangement demonstrated a practical method by which Plaintiff could continue working while avoiding the location she had reported as unsafe.

175. By December 2025, Amtrak had substantially more explicit notice of Plaintiff's disability-related circumstances, psychiatric treatment, leave, workplace-trauma allegations, and asserted need for a safe-access accommodation.

176. Plaintiff's December 19 submission expressly presented a disability-related safety-accommodation request together with leave and occupational-injury concerns.

177. Plaintiff later repeated a prospective safe-work accommodation request in the March 4-5 Rule 64 submissions, seeking alternate lodging and/or an agreed off-property pickup/drop-off location so she could work without being required to enter or stage from the Clark hotel property.

178. Plaintiff alleges that the requested off-property access arrangement was workable in practice because Amtrak supervision had previously approved and implemented substantially the same pickup arrangement in August 2025 and Plaintiff had used that arrangement to continue reporting for work.

179. Plaintiff alleges that Amtrak did not complete an effective interactive process or establish a clear prospective safe-access accommodation in response to her December 2025 and March 2026 requests before denying the March claim.

180. Plaintiff alleges that Amtrak instead continued routing the connected matter among Leave Management, Medical Services, EAP, Ethics, Compliance, Legal, Labor Relations, Return to Work, and other channels, while the safe-access, work-related classification, and return-to-work issues remained disputed.

181. Plaintiff was willing to provide employment-related medical confirmation necessary for leave, accommodation, and return-to-work purposes, but objected to unnecessarily broad dissemination of detailed private mental-health information to non-treatment personnel.

182. Plaintiff relies on those privacy concerns as part of the disability-related employment consequences and damages; she does not plead a separate common-law medical-privacy tort in this Complaint.

183. Plaintiff alleges that with reasonable safe-access and return-to-work arrangements she was capable of continuing or resuming employment and repeatedly demonstrated an intent to work rather than avoid work.

184. By July and August 2026, Plaintiff had returned to work and continued using Amtrak's leave and accommodation channels rather than abandoning employment. The later Leave Management referral of her own-health intermittent-leave request to the reasonable-accommodation process confirms that the accommodation process remained active after her return.

## XIX. JULY RETURN TO WORK AND AUGUST 2026 LEAVE/ACCOMMODATION ADMINISTRATION

185. Plaintiff returned to active work on July 24, 2026. On August 10, B&B Supervisor Peter J. Donnelly supplied return-to-work information in connection with an account-reactivation request showing Plaintiff's job title as B&B Mechanic, leave start date September 14, 2025, and return date July 24, 2026.

186. On August 7, 2026, Leave Management issued Case No. 113294 concerning Plaintiff's requested intermittent leave for her own health condition beginning August 21, 2026. Amtrak calculated 174.50 hours worked in the preceding twelve months, found Plaintiff ineligible for FMLA under that calculation, and expressly advised that she might be eligible for a reasonable accommodation and should submit the accommodation form to ADA@amtrak.com.

187. The Case No. 113294 notice copied B&B Supervisor Peter Donnelly and Matthew P. Chalupa, thereby placing both recipients on written notice that Plaintiff's August 21 request was being routed from FMLA review into Amtrak's reasonable-accommodation process.

188. The same day, Leave Management issued Case No. 113296 concerning intermittent leave requested in connection with Plaintiff's mother beginning August 3, 2026. Amtrak calculated 295.00 hours worked in the preceding twelve months, found Plaintiff ineligible for FMLA under that calculation, and directed her to work with her department for time off as needed. Donnelly and Chalupa were also copied on that notice.

189. On August 10, Plaintiff requested a written explanation and supporting records concerning the different 174.50- and 295.00-hour calculations, her prior FMLA usage and entitlement period, the

relationship between earlier leave and the pending requests, concurrency and classification questions, and the relationship between the new own-health request and her existing disability, accommodation, and occupational-injury history.

190. Plaintiff expressly stated that her request for clarification was not an acceptance or waiver of her position that the underlying condition and prior leave were workplace-connected.

191. On August 17, 2026, Leave Management acknowledged Ticket No. 442023 and stated that it was reviewing Plaintiff's concerns and requests and would follow up after gathering information.

192. On August 20, 2026, after Plaintiff's mother died, Plaintiff notified B&B Supervisor Peter J. Donnelly in writing that she would not report that day, specifically requested a personal day for August 20 in connection with the pending accommodation/FMLA review, stated that August 21 was already scheduled as PTO, and expressly stated that she was not yet designating either date as bereavement leave.

193. Donnelly responded by proposing a different designation: he stated that Amtrak provided three bereavement days and that he would notify the foreman to enter bereavement rather than PTO, even though Plaintiff had expressly asked to preserve bereavement leave until funeral arrangements were known.

194. Plaintiff immediately clarified the same morning, copying Leave Management and the HR Employee Resource Center, that her requested allocation remained personal time for August 20 and PTO for August 21, that she wanted to preserve the three bereavement days, and that neither date should yet be coded as bereavement.

195. Plaintiff also asked Amtrak to identify her available personal and PTO balances and to confirm in writing how August 20 and August 21 would be recorded. Donnelly responded that he was not at work and could not confirm the available PTO until he returned.

196. On August 21, Plaintiff learned through a B&B foreman that her requested allocation had not initially been followed: PTO had been entered for August 20, while a personal day was then being

considered for August 21. The same exchange stated that only 1.3 hours of PTO remained and that a personal day could be used only if Plaintiff requested it and it was available.

197. Plaintiff had already made that personal-day request in writing on August 20. She promptly reiterated that August 20 was to be the personal day and August 21 the PTO day and requested that the entries be corrected to match her stated election.

198. Plaintiff alleges that this sequence is relevant because her written leave election, made while the accommodation/FMLA review was pending and copied to responsible Amtrak channels, was not initially implemented as requested and required further correction efforts.

199. Plaintiff does not allege, without supporting records, who made or authorized the initial coding decision. She seeks the underlying timekeeping, attendance, leave, and communication records to determine how the coding was entered and whether it was corrected.

200. Plaintiff does not plead the August time-coding sequence, standing alone, as proof of unlawful retaliation or as a freestanding FMLA cause of action. She pleads it as evidence of employer notice, the still-pending accommodation process, and continuing administrative consequences of the disability/leave matters alleged above.

201. The foregoing chronology identifies the principal Amtrak and related channels involved in notice and administration - including field supervision and bargaining-unit foremen, corporate lodging contacts, EAP, Medical Services/Return to Work, Ethics, Compliance, Legal, Labor Relations, Workforce Management, Leave Management/HR, and later field supervision. Plaintiff does not allege that every person copied on an email committed discrimination; the roles are pleaded to identify notice, routing, decisionmaking, and records within Amtrak's control.

## XX. COMPARATOR AND DISCRIMINATION CONTEXT

202. Plaintiff is a Black woman who was over forty years old throughout the relevant events.

203. The RT Forklift event presents the most specific race, sex, and age comparator allegations: Plaintiff alleges that approximately four or five younger white men received priority during portions

of the trainer-led session scheduled for her and that the resulting diversion left her own training and qualification process incomplete.

204. The September vehicle/staging event presents a separate direct sex comparator: the male coworkers and foremen were released from duty and allowed to go to their rooms while Plaintiff, the only woman in the group, was required to remain in the company vehicle.

205. Plaintiff does not rely on the race or sex of decisionmakers alone as proof of discriminatory intent.

206. Plaintiff alleges that Amtrak controls the training rosters, schedules, employee demographic and qualification data, supervisor communications, staging records, assignment records, and decisionmaking records necessary to determine how similarly situated employees were treated.

207. Plaintiff seeks discovery concerning the race, sex, age, scheduled status, qualification status, training time, hands-on operating opportunities, qualification opportunities, staging/release treatment, and assignment treatment of relevant comparators.

208. Plaintiff alleges that the comparator facts, the loss of portions of her scheduled trainer-led training time, the direct male-versus-female release disparity, the employer's later explanations, and the continuing qualification consequences support an inference that protected characteristics affected the challenged treatment.

## XXI. CONTINUING EMPLOYMENT CONSEQUENCES

209. The RT Forklift qualification remains relevant to Plaintiff's employment opportunities.

210. In August 2026, Amtrak circulated advertisements for permanent B&B Mechanic (RT Forklift) positions identifying FORKLIFT RT as a qualification.

211. Plaintiff does not allege that the August 2026 advertisements themselves constitute a new discriminatory act in this Complaint.

212. Plaintiff alleges that the advertisements demonstrate that the qualification affected by the 2025 training dispute remains materially relevant to current employment opportunities.

213. Plaintiff may bid for positions subject to satisfying applicable qualifications, but she alleges that had the regular 2025 trainer-led training and qualification process been completed fairly, she would not still be facing the same unresolved training and qualification consequence.

214. Plaintiff also alleges continuing consequences from the disputed leave, occupational classification, accommodation, and return-to-work handling to the extent those consequences are proven to have been caused by unlawful conduct alleged in this Complaint.

**COUNT I - TITLE VII - SEX DISCRIMINATION**

215. Plaintiff repeats and realleges the preceding paragraphs.

216. Plaintiff is a woman protected from discrimination because of sex under Title VII.

217. Plaintiff held the B&B Mechanic (RT Forklift) position and was scheduled for the trainer-led RT Forklift training and qualification process associated with that position.

218. Plaintiff alleges that sex was a motivating factor in materially different treatment affecting her training, qualification, and conditions of employment.

219. During Plaintiff's scheduled RT Forklift session, approximately four or five younger white male employees who were not scheduled for Plaintiff's training date were permitted to take precedence during portions of her scheduled training time. Plaintiff was the woman for whom the training had been scheduled.

220. Plaintiff does not allege that Amtrak was prohibited from training multiple employees in a session and did not request special, individualized, or one-on-one training. Plaintiff alleges that Trainer Greg could have completed her scheduled trainer-led training and qualification process first and then trained additional employees afterward, including multiple employees if the remaining time permitted. Instead, portions of Plaintiff's scheduled training time were diverted to the additional male employees and her own process was left incomplete.

221. During the September 8 vehicle/staging event, Plaintiff was the only woman in the relevant group. At the end of the work period, the male coworkers and foremen were released and permitted to

go to their rooms, while Plaintiff alone was required to remain in the company vehicle for approximately thirty minutes.

222. Plaintiff alleges that the direct male-comparator treatment in the RT Forklift and September staging events, considered with the surrounding circumstances, supports a reasonable inference that sex was a motivating factor in the materially different treatment.

223. As a direct and proximate result of Defendant's alleged Title VII sex discrimination, Plaintiff suffered damages and other legally compensable harm.

**COUNT II - TITLE VII - RACE DISCRIMINATION**

224. Plaintiff repeats and realleges the preceding paragraphs.

225. Plaintiff is Black and is protected from discrimination because of race under Title VII.

226. Plaintiff alleges that race was a motivating factor in materially different treatment affecting her RT Forklift training and qualification opportunity.

227. Based on Plaintiff's personal observation and knowledge, the approximately four or five employees who were permitted to take precedence during portions of the training time scheduled for Plaintiff were white men, while Plaintiff was the Black woman for whom the training had been scheduled.

228. Plaintiff alleges that the allocation of portions of her scheduled training time to those employees contributed to her trainer-led training and qualification process being rushed, divided, and left incomplete.

229. Plaintiff was not requesting special or individualized training. Her complaint was that the trainer-led process already scheduled for her could have been completed before additional employees were permitted to take precedence during portions of her scheduled session.

230. Plaintiff further relies on Amtrak's subsequent handling and explanations of the training dispute as evidence to be considered with the original disparity, without alleging that every subsequent employment action was independently motivated by race.

231. Plaintiff alleges that the comparator circumstances and resulting training harm support a reasonable inference of race discrimination. Amtrak possesses the training rosters, scheduling records, qualification records, personnel information, and related records identifying the employees who received training during Plaintiff's scheduled session.

232. As a direct and proximate result of Defendant's alleged Title VII race discrimination, Plaintiff suffered damages and other legally compensable harm.

**COUNT III - TITLE VII - RETALIATION**

233. Plaintiff repeats and realleges the preceding paragraphs.

234. On December 18, 2025, Plaintiff expressly opposed what she described to Amtrak as gender-based discrimination and retaliation and requested investigation through Amtrak's SpeakUp/Ethics process.

235. Plaintiff thereafter continued supplying records and objections concerning the connected training, safe-access, injury, leave, and employment matters through Amtrak's Ethics, Compliance, Medical Services, Legal, Labor Relations, Engineering/Workforce, and related channels.

236. Before March 27, 2026, Amtrak had institutional notice of Plaintiff's protected discrimination opposition. In addition, Kristin Leese and Bill Lee Jo Titlow had been directly provided Plaintiff's March Rule 64 submissions concerning the same underlying RT Forklift training, safe-access, work-record, and leave disputes, with those submissions referencing Plaintiff's Ethics matter and incorporating supporting materials.

237. Plaintiff does not allege that her December 18, 2025 protected complaint caused conduct occurring before that complaint, including the September 8-9, 2025 staging event.

238. On March 27, 2026, after Plaintiff's protected opposition, Amtrak issued a new written decision concerning Claim No. 294826 and denied the employment relief Plaintiff had requested concerning the same connected training, safe-access, work-record, and leave matters. Plaintiff possesses

materially similar versions bearing the signatures of Kristin Leese and Bill Lee Jo Titlow and does not presently know which version Amtrak treated as final or controlling.

239. In the March 27 decision, Amtrak characterized Plaintiff's incomplete trainer-led RT Forklift training as Plaintiff not being ready 'to test to qualify,' asserted that Request to Demonstrate was her 'only option,' and treated her temporary movement to the Bus Driver vacancy as eliminating her entitlement to further RT Forklift training. The Titlow-signed version further characterized Plaintiff's alleged issues as 'baseless and frivolous.'

240. Plaintiff alleges that the timing, continuation of the same disputed employment matters after Amtrak received her protected discrimination opposition, and the manner in which those matters were subsequently characterized and denied support an inference of retaliation.

241. Plaintiff alleges that retaliatory motive was a but-for cause of one or more materially adverse post-protected-activity actions. Plaintiff seeks discovery concerning what discrimination-related information was provided to, received by, reviewed by, or discussed among the persons who prepared, reviewed, approved, issued, or relied upon the March 27 decision and other subsequent employment decisions.

242. As a direct and proximate result of Defendant's alleged Title VII retaliation, Plaintiff suffered damages and other legally compensable harm.

## COUNT IV - ADA - DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE

243. Plaintiff repeats and realleges the preceding paragraphs.

244. Plaintiff had an actual disability and a record of disability within the meaning of the ADA during the relevant period.

245. Plaintiff's impairment, when active, substantially limited one or more major life activities, and her treatment record included psychiatric hospitalization and medically necessary leave.

246. Plaintiff was a qualified individual capable of performing the essential functions of her employment with or without reasonable accommodation as applicable.

247. No later than December 2025, Amtrak had explicit notice of Plaintiff's disability-related medical circumstances, treatment and leave, workplace-trauma allegations, and asserted need for a safe-access accommodation.

248. Plaintiff requested a prospective disability-related employment accommodation that would permit alternate lodging and/or pickup and drop-off at an agreed off-property location so that she could continue working without being required to enter or stage from the Holiday Inn Clark property.

249. The requested arrangement was workable in practice because Amtrak supervision had previously approved and implemented substantially the same off-property pickup arrangement in August 2025, and Plaintiff had used that arrangement to continue reporting for work.

250. Plaintiff alleges that Amtrak did not complete an effective interactive process or establish a clear prospective safe-access accommodation in response to her December 2025 and March 2026 requests before denying the March claim.

251. Plaintiff further alleges that Amtrak's disability-related employment administration, including disputed leave classification, safe-access handling, and return-to-work consequences, continued after Amtrak had notice of her disability. Plaintiff does not allege that every administrative disagreement constituted a separate ADA violation.

252. Plaintiff does not contend that every disagreement over occupational-injury classification is itself an ADA violation. She alleges that Amtrak's failure to provide reasonable accommodation and its disability-related employment treatment, considered in the factual context alleged above, denied her rights protected by the ADA.

253. As a direct and proximate result of Defendant's alleged ADA discrimination and failure to accommodate, Plaintiff suffered damages and other legally compensable harm.

**COUNT V - ADA - RETALIATION**

254. Plaintiff repeats and realleges the preceding paragraphs.

255. Plaintiff engaged in activity protected by the ADA by requesting disability-related safe-access accommodation, seeking correction of disability-related employment barriers, and opposing treatment she reasonably believed interfered with her disability rights.

256. Amtrak received those protected requests through Medical Services, Return to Work, Ethics, Compliance, Legal, Labor Relations, Leave Management, management, and other employer channels.

257. Plaintiff does not allege that the mere denial of an accommodation, standing alone, constitutes retaliation. Her retaliation claim concerns materially adverse treatment occurring after her protected disability-related requests that was separate from the underlying failure to provide the requested accommodation.

258. After Plaintiff's disability-related requests, Amtrak's March 27, 2026 decision did more than reject the requested safe-access arrangement. It also addressed and denied related employment relief concerning Plaintiff's RT Forklift training and qualification, work-record and leave matters, characterized her incomplete trainer-led training as Plaintiff not being ready 'to test to qualify,' and treated her temporary movement to the Bus Driver vacancy as eliminating her asserted entitlement to further RT Forklift training.

259. Plaintiff alleges that, to the extent the evidence establishes that those separate materially adverse employment determinations were made because of her protected disability-related requests and objections, such conduct constituted retaliation under the ADA. Plaintiff seeks discovery concerning what disability and accommodation information was provided to, received by, reviewed by, or discussed among the persons involved in the March 27 decision and other later employment decisions.

260. As a direct and proximate result of Defendant's alleged ADA retaliation, Plaintiff suffered damages and other legally compensable harm.

**COUNT VI - ADEA - AGE DISCRIMINATION**

261. Plaintiff repeats and realleges the preceding paragraphs.

262. Plaintiff was over forty years old at all relevant times and is protected by the ADEA.

263. The RT Forklift training event provides the factual basis for Plaintiff's ADEA claim.

264. Plaintiff alleges from her personal observation and knowledge that the approximately four or five employees who were permitted to take precedence during portions of her scheduled RT Forklift training were younger than Plaintiff.

265. Those employees received portions of the training opportunity scheduled for Plaintiff, contributing to Plaintiff's trainer-led training and qualification process being interrupted and left incomplete.

266. Plaintiff alleges that age was a but-for cause of the unequal treatment in the allocation of her scheduled training opportunity.

267. Amtrak possesses the personnel, age, training-roster, scheduling, qualification, and related records necessary to establish the ages and circumstances of the employees who received the training opportunities at issue.

268. As a direct and proximate result of Defendant's alleged ADEA violation, Plaintiff suffered economic and other relief recoverable under the ADEA, subject to proof.

**COUNT VII - NEW JERSEY LAW AGAINST DISCRIMINATION**

269. Plaintiff repeats and realleges the preceding paragraphs.

270. The New Jersey Law Against Discrimination prohibits an employer from discriminating in employment because of race, sex, age, and disability and prohibits retaliation for protected opposition and requests for rights protected by the statute.

271. The material New Jersey employment events alleged in this Complaint include Plaintiff's Clark assignment, work-connected headquarters/staging conditions, the August off-property pickup arrangement approved in practice by supervision, Plaintiff's September return, the vehicle/staging treatment, RT Forklift training and qualification consequences, later disability-related accommodation requests, and Amtrak's handling of related complaints.

272. Plaintiff alleges that Amtrak subjected her to discrimination because of sex, race, age, and/or disability through the materially different training, qualification, staging, and disability-related employment treatment alleged above, with each protected-class theory resting on the factual circumstances specifically alleged for that theory.

273. Plaintiff further alleges that after she expressly opposed discrimination and later requested disability-related employment protection, Amtrak subjected her to materially adverse treatment to the extent alleged above and proven to have been caused by protected activity. Plaintiff does not allege that every later administrative disagreement constituted retaliation.

274. Plaintiff's NJLAD claim arises from independent statutory rights and does not require the Court to enforce the CBA as the source of the right asserted.

275. To the extent a particular CBA provision supplies factual context, Plaintiff relies on it only to explain Amtrak's stated rationale, the employment setting, or evidence of pretext, not as an independent state-law contract claim.

276. As a direct and proximate result of Defendant's alleged NJLAD violations, Plaintiff suffered damages and other legally compensable harm.

**DAMAGES AND RELIEF**

277. As a result of the alleged unlawful conduct, Plaintiff has suffered and continues to suffer emotional distress, humiliation, anxiety, loss of dignity, treatment-related consequences, disruption of leave and return-to-work processes, impairment of employment and qualification opportunities, out-of-pocket expenses, and economic losses to the extent established by proof.

278. Plaintiff seeks back pay, lost benefits, front pay where appropriate, and other economic relief only to the extent caused by the unlawful conduct proven in this action.

279. Plaintiff seeks compensatory damages under Title VII, the ADA, and NJLAD to the extent permitted by law and proven.

280. Plaintiff seeks punitive damages under Title VII, the ADA, and NJLAD only to the extent legally available and supported by the required proof.

281. Plaintiff seeks any liquidated or other enhanced damages available under the ADEA only to the extent the applicable statutory requirements, including willfulness where required, are proven.

282. Plaintiff seeks appropriate equitable and prospective relief necessary to prevent continuing discrimination or retaliation and to require nondiscriminatory consideration of RT Forklift training and qualification opportunities, disability-related safe-access accommodation, leave, and return-to-work matters within Amtrak's control.

283. Plaintiff seeks prejudgment and post-judgment interest, recoverable costs, and such other relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment in her favor and against Defendant and requests that the Court:

A. Declare that Defendant violated Plaintiff's rights under the federal and state employment-discrimination statutes identified above to the extent proven;

B. Award appropriate injunctive and equitable relief;

**C. Award back pay, lost benefits, front pay where appropriate, and other economic damages to the extent proven and recoverable;**

**D. Award compensatory damages for emotional distress and other non-economic injury as permitted by law;**

E. Award punitive damages to the extent legally available and supported by the required proof;

F. Award liquidated damages under the ADEA to the extent legally available and supported by the required proof;

G. Award prejudgment and post-judgment interest;

H. Award recoverable costs; and

**I. Award such other and further relief as the Court deems just and proper.**

**JURY DEMAND**
Plaintiff demands a trial by jury on every claim and issue for which a jury trial is available by law.

Dated: August 24, 2026

Respectfully submitted,

Barbara Thompson
_______________________________

Barbara J. Thompson
Plaintiff, Pro Se
130-28 149th Street
Jamaica, New York 11436
Telephone: 518-229-9035
Email: Redbjt@hotmail.com

# EXHIBIT A

## NRPC Form 3476 - Request to Demonstrate Qualifications on M/W Equipment

AMTRAK

**Request to Demonstrate Qualifications on M/W Equipment**

Name Barbara Thompson

SAP# 00834595

Address 656 Matsh Road

Phone Number 518-229-9035

City, State Zip Glen Wild NY 12738

Supervisor Name Robert Swartz

Present Position Track Bus Driver

Work Location A Track River to Gunpow

Gang# XUC2 Y04

Employee Email Barbara.Thompson@amtrak.com

Please consider this request to demonstrate my qualifications on the following piece of equipment:

**LIST ONE ITEM PER FORM ONLY**

RT Folk Lift

Name of Equipment or Machine/Code Number

**NOTE:** YOU **MUST** BE PROFICIENT IN YOUR ABILITY TO MAINTAIN AND OPERATE ANY EQUIPMENT OR MACHINE LISTED ABOVE. THIS IS **NOT** A TRAINING OPPORTUNITY.

Sincerely yours,

Barbara Thompson

The completed request may be emailed or faxed to:

E-mail:
DLTrainingreq01@amtrak.com

Fax:
202-799-6380

NRPC 3476 (05/2018)

Amtrak is a registered service mark of the National Railroad Passenger Corporation.

# EXHIBIT B

## EEOC Dismissal and Notice of Right to Sue - Charge No. 524-2026-01134 - Issued May 27, 2026

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Newark Area Office**
283-299 Market St, Suite 1703
Newark, NJ 07102
(862) 338-9410
Website: www.eeoc.gov

**DISMISSAL**
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 05/27/2026

**To:** Mrs. Barbara J. Thompson
130-28 149th Street
Jamaica, NY 11436
Charge No: 524-2026-01134

EEOC Representative and email: GERHARD GARCIA
INVESTIGATOR
GERHARD.GARCIA@EEOC.GOV

---

**DISMISSAL**

The EEOC is closing this charge because the facts alleged in the charge fail to state a claim under any of the laws enforced by EEOC.

**NOTICE OF YOUR RIGHT TO SUE**

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 524-2026-01134.

On behalf of the Commission,

For Gerhard Garcia Digitally signed by Gerhard Garcia Date: 2026.05.27 14:47:35 -04'00'

John Waldinger
Area Office Director

**Cc:**
Amtrak
36 Valley Rd
CLARK, NJ 07066

Rokisha Caldwell
Amtrak
1 MASSACHUSETTS AVE NW
Washington, DC 20001

Please retain this Notice for your records.

## INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 524-2026-01134 to the District Director at Arlean Nieto, 33 Whitehall St 5th Floor, New York, NY 10004.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 524-2026-01134 to the District Director at Arlean Nieto, 33 Whitehall St 5th Floor, New York, NY 10004.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)**

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- ✓ **Only one** major life activity need be substantially limited.
- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

**are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.
- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.